LEXICON LAW, PC
JOHN R. HABASHY, State Bar No. 236708
TIFFANY N. BUDA, State Bar No. 232679
633 W. 5th Street, 28th Floor
Los Angeles, CA 90071
Telephone:   (213) 223-5900
Facsimile:   (888) 373-2107
Email:        john@exiconlaw.com
              tiffany@lexiconlaw.com

Attorneys for Plaintiffs,
Alejandro Medina and Cinthya Medina

## UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ALEJANDRO MEDINA and CINTHYA MEDINA; | Case No. 5:19-cv-00883 |
| Plaintiffs, | **PLAINTIFFS' FIRST AMENDED COMPLAINT FOR:** |
| vs. | 1. Violations of Real Estate Settlement Procedures Act, 12 C.F.R. § 1024, *et seq.* |
| WELLS FARGO BANK, NATIONAL ASSOCIATION; and DOES 1 through 10 inclusive; | *2.* Violations of the Homeowner's Bill of Rights, Cal. Civ. Code. § 2920, *et seq.* |
| Defendants. | 3. Violations of the "UCL," Cal. Bus. and Prof. Code § 17200, *et seq.* |
| | 4. Negligence, California Civil Code § 1714 |
| | **JURY TRIAL DEMANDED** |

1          *Medina v. Wells Fargo Bank, N.A., et al.*

**FIRST AMENDED COMPLAINT**

PLAINTIFFS ALEJANDRO MEDINA ("Mr. Medina") and CYNTHIA MEDINA ("Mrs. Medina") and for their First Amended Complaint for Damages allege as follows against defendants WELLS FARGO BANK, NATIONAL ASSOCIATION ("Wells Fargo" or "Defendant"), and DOES 1 through 10, inclusive:

## I. JURISDICTION AND VENUE

1.      This Court has subject matter pursuant to 28 U.S.C. §§ 1331 and 1337 based on Mr. and Mrs. Medina's claims under the Real Estate Settlement Procedures Act ("RESPA"), 12 U.S.C. § 2614.

2.      This Court, alternatively, has diversity jurisdiction pursuant to 28 U.S.C. § 1332, as the matter in controversy exceeds $75,000.00 and the matter is between citizens of different states.

3.      This Court has supplemental jurisdiction to hear and determine Mr. and Mrs. Medina's state law claims pursuant to 28 U.S.C. § 1367 because those claims are related to Mr. and Mrs. Medina's federal law claims and arise out of a common nucleus of related facts.  Mr. and Mrs. Medina's state law claims are related to Mr. and Mrs. Medina's federal law claims such that those claims form part of the same case or controversy under Article III of the United States Constitution.

4.      This court has authority to issue injunctive relief by virtue of Federal

Rules of Civil Procedure Rule 65(a); further this court has authority to issue declaratory judgment by virtue of 28 U.S.C. § 2201.

5.     Personal jurisdiction over Defendant is proper pursuant to Fed. R. Civ. P. 4(k).  Furthermore, the Court has personal jurisdiction over Defendant as Defendant conducts business within this district and has purposefully availed itself of the laws and markets of the state of California and this district.

6.     Venue is proper before this court pursuant to 28 U.S.C. § 1391(b)(2) since all incidents, events, and occurrences and omissions giving rise to this action occurred within the Central District of California.  The Eastern Division is the proper division in that the real property that is the subject of this action is located in Riverside County, California.

## II.  PRELIMINARY STATEMENT

7.     This is an action for actual and statutory damages filed by Plaintiffs, ALEJANDRO and CINTHYA MEDINA arising out of their repeated attempts to save their family home from foreclosure, only to suffer the irreparable loss of their home after months of unconscionable treatment at the hands of the Defendant, WELLS FARGO BANK, NATIONAL ASSOCIATION.  Defendant serially and alternatively provided misinformation, apathy, and inaction in response to Mr. and Mrs. Medina's repeated attempts to find a foreclosure alternative that would enable them to keep their home.  Defendant refused to postpone foreclosure by as little as

a few weeks in order to complete their review of Mr. and Mrs. Medina's loss mitigation application for a foreclosure alternative ("application") and to allow Mr. and Mrs. Medina the precious time they needed to obtain a loan from CalHFA. Instead, Defendant proceeded to unlawfully conduct a foreclosure sale on Mr. and Mrs. Medina's home while their application was under review.  Mrs. Medina suffered extreme mental anguish and emotional distress and was hospitalized for a mental breakdown as a direct result of Defendant's unlawful and unconscionable actions.

8.     Mr. and Mrs. Medina bring this action for actual and statutory damages due to Defendant's violations of the Real Estate Settlement Procedures Act ("RESPA"), 12 U.S.C. §2601 *et seq*., which was passed to eliminate abusive practices in the servicing of real estate loans.  Mr. and Mrs. Medina also bring this action for actual and statutory damages due to Defendant's violation of the Homeowner's Bill of Rights, ("HBOR"), A.B. 278, Chapter 86, 2011-2012, California Civil Code §§ 2923.4, 2923.5 and 2924.15, which was passed to guarantee basic fairness and transparency for homeowners in the foreclosure process.  Both RESPA and HBOR prevent "dual tracking," which means that the foreclosure process is to be essentially paused until a complete application has been fully reviewed.   However, Wells Fargo unlawfully engaged in dual tracking, and proceeded with foreclosure even while Mr. and Mrs. Medina's complete application

was under review.  Defendant further violated RESPA by failing to respond to Mr. and Mrs. Medina's Requests for Information and Notice of Errors letters.

9.      Wells Fargo's actions also violated California's Unfair Competition Law, Cal. Bus. and Prof. Code § 17200 et seq. (the "UCL"), which prohibits unlawful unfair, and/or fraudulent business acts and/or practices.

10.     Further, Defendant was negligent in the handling of Mr. and Mrs. Medina's application.  Defendant unreasonably delayed in the processing of their complete application and refused to postpone the foreclosure sale of her home by as little as a few weeks in order to complete the review of their application, and in order to allow Mr. and Mrs. Medina the time to finalize a loan from CalHFA.  Thus, this is also an action for negligence in the servicing of Mr. and Mrs. Medina's mortgage loan.

### III.  THE PARTIES

11.     Plaintiffs, Alejandro and Cinthya Medina, are, and were at all times mentioned herein over the age of 18 and are residents of Los Angeles County, California.  Mr. and Mrs. Medina are domiciled in and are citizens of California.  Mr. and Mrs. Medina's home was located in Temecula, CA (the "Property") and was, at all relevant times, owner-occupied. The Property was Mr. and Mrs. Medina's principal and family residence.  The mortgage loan that was secured by Mr. and Mrs. Medina's Property (the "mortgage loan") was a  first-lien, federally related mortgage

**FIRST AMENDED COMPLAINT**

loan that was secured by residential property, upon which there was a structure for occupancy of from one to four families for which the loan was made by any lender that is regulated by an agency of the Federal Government or is made by a creditor that makes or invests in residential real estate loan aggregating more than $1,000,000.00 per year.

12.     Defendant WELLS FARGO BANK, NATIONAL ASSOCIATION (hereinafter "Wells Fargo" or "Defendant") is a Delaware corporation, with its headquarters at 101 N. Phillips Avenue, Sioux Falls, South Dakota, 57104, and at all times material to this action, Defendant Wells Fargo regularly transacts and conducts significant business in the State of California.  Defendant is the former holders, assignees and/or servicers of a mortgage on Mr. and Mrs. Medina's home.

13.     The true names and capacities of DOES 1 through 10 are currently unknown to Mr. and Mrs. Medina who allege that DOES 1 through 10 are responsible in some manner for the injuries sustained by Mr. and Mrs. Medina as hereinafter alleged.  Mr. and Mrs. Medina request leave to file amendments to this complaint alleging the true names and capacities of DOES 1 through 10 when the same have been ascertained.

14.     Mr. and Mrs. Medina are informed and believe, and on that basis allege, that at all times herein mentioned each of the Defendants was an agent, servant, employee, and/or joint venture of each of the remaining Defendants, and was at all

**FIRST AMENDED COMPLAINT**

times acting within the course and scope of such agency, service, employment, and/or joint venture, and each Defendant has ratified, approved, and authorized the acts of each of the remaining Defendants with full knowledge of said facts.

15.     Defendants, and each of them, aided and abetted, encouraged, and rendered substantial assistance to the other Defendants in breaching their obligations to Mr. and Mrs. Medina, as alleged herein. In taking action, as alleged herein, to aid and abet and substantially assist the commissions of these wrongful acts and other wrongdoings complained of, each of the Defendants acted with an awareness of its/his/her primary wrongdoing and realized that its/his/her conduct would substantially assist the accomplishment of the wrongful conduct, wrongful goals, and wrongdoing.

16.     There is a unity of interest between Defendants, and each acts as the alter ego of the other.

17.     The defendants identified in paragraphs 12 through 16 above shall hereinafter be collectively referred to as "Defendants."

## IV.  STANDING

18.     Standing is proper under Article III of the Constitution of the United States of America because Mr. and Mrs. Medina's claims state:

    a.  A valid injury in fact;

    b.  Which is traceable to the conduct of Defendants;

c.  And is likely to be redressed by a favorable judicial decision.

See *Spokeo, Inc. v. Robins 578 U.S. ____(2016) at 6*, and *Lujan v. Defenders of Wildlife, 504 U.S. 555 at 560.*

19.    In order to meet the standard laid out in *Spokeo* and *Lujan*, Mr. and Mrs. Medina must clearly allege facts demonstrating all three prongs above.

**A.    The "Injury in Fact" Prong**

20.    Mr. and Mrs. Medina's injury in fact must be both "concrete" and "particularized" in order to satisfy the requirements of Article III of the Constitution, as laid out in *Spokeo* (*Id.*).

21.    For an injury to be "concrete" it must be a *de facto* injury, meaning that it actually exists.  In the present case, a wrongful foreclosure sale was conducted against Mr. and Mrs. Medina by Defendants and Defendants pursued an unlawful foreclosure sale while a complete application was under review.  Such an unlawful foreclosure sale was extremely emotionally distressing and stressful, and defending against it had been at great expense and cost to Mr. and Mrs. Medina.  All these injuries are concrete and *de facto*.

22.    For an injury to be "particularized" means that the injury must "affect the Plaintiff in a personal and individual way." *Spokeo, Inc. v. Robins, 578 U.S. ____(2016) at *7.*  Mr. and Mrs. Medina's home and peace of mind were threatened

**FIRST AMENDED COMPLAINT**

by Defendants' wrongful foreclosure sale while their complete application was under review.  All these injuries are particularized and specific to Mr. and Mrs. Medina.

### B.    The "Traceable to the Conduct of Defendant" Prong

23.    The second prong required to establish standing at the pleadings phase is that Mr. and Mrs. Medina must allege facts to show that Mr. and Mrs. Medina's injury is traceable to the conduct of Defendants.

24.    In the instant case, this prong is met simply by the fact that the untimely review of Mr. and Mrs. Medina's application and unlawful and wrongful foreclosure sale had been initiated by Defendants directly, or by their agents at their direction and control.

### C.    The "Injury is Likely to be Redressed by a Favorable Judicial Opinion" Prong

25.    The third prong to establish standing at the pleadings phase requires Mr. and Mrs. Medina to allege facts to show that the injury is likely to be redressed by a favorable judicial opinion.

26.    In the present case, Mr. and Mrs. Medina's Prayers for Relief include a request for damages for each violation of RESPA, as authorized by statute in 12 U.S.C. § 2605(f), and for each violation of HBOR, as authorized by statute in Cal. Civ. Code § 2924.12.  The statutory damages were set by Congress and the State of

California and specifically redress the financial damages suffered by Mr. and Mrs. Medina due to Defendants' unlawful conduct.

27.     Mr. and Mrs. Medina's Prayers for Relief also include a request for actual damages that Mr. and Mrs. Medina have suffered due to the unlawful and wrongful conduct of Defendants, and specifically redress the emotional distress, physical distress, and expenses and costs Mr. and Mrs. Medina have suffered as a direct result of Defendants' unlawful foreclosure action.

28.     The award of monetary damages redresses the injuries of the past, the present, and prevent further injury in the future.

29.     Because all standing requirements of Article III of the U.S. Constitution have been met, as laid out in *Spokeo, Inc. v. Robins, 578 U.S. ___ (2016),* Mr. and Mrs. Medina have standing to sue Defendants on the stated claims.

## V.  SUMMARY OF CLAIMS

### A.     RESPA

30.     In January 2013, the Consumer Financial Protection Bureau ("CFPB") issued a number of final rules concerning mortgage markets in the United States, pursuant to the Dodd-Frank Act, Public Law No. 111-203, 124 Stat. 1376 (2010).

31.     Specifically, on January 17, 2013, the CFPB issued the Real Estate

**FIRST AMENDED COMPLAINT**

Settlement Procedures Act ("RESPA") (Regulation X) Mortgage Servicing Final Rules, 78 F.R. 10695 (February 14, 2013), and TILA (Regulation Z) Mortgage Servicing Final Rules, 78 F.R. 10901 (February 14, 2013), which became effective on January 10, 2014.

32.   The CFPB published a preamble to the rules where it provided an overview of the mortgage servicing market and the market failures the new rules were intended to address. *See*, 2012 RESPA Servicing Proposal, 77 FR 57200 (Sept. 17 2012).[1]

33.   Section 1463(a) of the Dodd-Frank Act adds section 6(k)(1)(E) to RESPA, which provides that a servicer of a federally related mortgage loan must "comply with any other obligation found by the [Bureau], by regulation, to be appropriate to carry out the consumer protection purposes of this Act."   This provision provides the Bureau authority to establish prohibitions on servicers of federally related mortgage loans appropriate to carry out the consumer protection purposes of RESPA. As discussed below, in light of the systemic problems in the mortgage servicing industry discussed above, the Bureau is exercising this authority in rulemaking to implement protections for borrowers with respect to mortgage servicing. *Id.* at 26.

34.   Mortgage servicing is performed by banks, thrifts, credit unions, and

---

[1]Relevant portions are included here, but the entire preamble is available at:
http://files.consumerfinance.gov/f/201301_cfpb_final-rule_servicing-tila-preamble.pdf

non-banks under a variety of business models. In some cases, creditors service mortgage loans that they originate or purchase and hold in portfolio. Other creditors sell the ownership of the underlying mortgage loan, but retain the mortgage servicing rights in order to retain the relationship with the borrower, as well as the servicing fee and other ancillary income. In still other cases, servicers have no role at all in origination or loan ownership, but rather purchase mortgage servicing rights on securitized loans or are hired to service a portfolio lender's loans. *Id.* at 14.

35.   These different servicing structures can create difficulties for borrowers if a servicer makes mistakes, fails to invest sufficient resources in its servicing operations, or avoids opportunities to work with borrowers for the mutual benefit of both borrowers and owners or assignees of mortgage loans. Although the mortgage servicing industry has numerous participants, the industry is highly concentrated, with the five largest servicers servicing approximately 53 percent of outstanding mortgage loans in this country. *Id.* at 14.

36.   Compensation structures vary somewhat for loans held in portfolio and securitized loans, but have tended to make pure mortgage servicing (where the servicer has no role in origination) a high-volume, low-margin business. *Id.* at 15. The primary exception being loans deemed by servicers to be in default.  Servicing of defaulted loans provides servicers with substantially greater fee income.

37.   Under this business model, servicers act primarily as payment

**FIRST AMENDED COMPLAINT**

collectors and processors, and will have limited incentives to provide other customer service. Servicers are generally not subject to market discipline from consumers because consumers have little opportunity to switch servicers. Rather, servicers compete to obtain business from the owners of loans—investors, assignees, and creditors—and thus competitive pressures tend to drive servicers to lower the price of servicing and scale their investment in providing service to consumers accordingly. *Id.* at 16.

38.   These attributes of the servicing market created problems for certain borrowers even prior to the financial crisis. For example, borrowers experienced problems with mortgage servicers even during regional mortgage market downturns that preceded the financial crisis.  There is evidence that borrowers were subjected to improper fees that servicers had no reasonable basis to impose, improper force-placed insurance practices, and improper foreclosure and bankruptcy practices. *Id.* at 17.

39.   [T]he Government Accountability Office (GAO) has found pervasive problems in broad segments of the mortgage servicing industry impacting delinquent borrowers, such as servicers who have misled, or failed to communicate with, borrowers, lost or mishandled borrower-provided documents supporting loan modification requests, and generally provided inadequate service to delinquent borrowers. It has been recognized in Inspector General reports, and the Bureau has

**FIRST AMENDED COMPLAINT**

learned from outreach with mortgage investors, that servicers may be acting to maximize their self-interests in the handling of delinquent borrowers, rather than the interests of owners or assignees of mortgage loans. *Id.* at 19.

40.     Here, the mortgage loan that was serviced by Defendant Wells Fargo was secured by residential property (the "mortgage loan") and is a "federally related mortgage loan" as defined by 12 C.F.R. § 1024.2(b).

41.     Thus, Defendants are subject to these Regulations X and Z and do not qualify for an exception for "small servicers", as defined in 12 C.F.R. § 1026.41(e)(4), nor any exemption for a "qualified lender", as defined in 12 C.F.R. § 617.700.

42.     Mr. and Mrs. Medina assert claims for relief against Defendants for violations of the specific rules set forth in Regulations X, and the FDCPA, as set forth *infra*.

43.     Mr. and Mrs. Medina assert a private right of action under RESPA pursuant to 12 U.S.C. §2605(f), and any such action provides for remedies including actual damages, costs, statutory damages, and attorneys' fees.

## B.     HBOR

44.     The Homeowner's Bill of Rights (Cal. Civ. Code, §§ 2920.5, 2923.4–.7, 2924, 2924.9–.12, 2924.15, 2924.17–.20) ("HBOR"), effective January 1, 2013, was enacted "to ensure that, as part of the nonjudicial foreclosure process,

**FIRST AMENDED COMPLAINT**

borrowers are considered for, and have a meaningful opportunity to obtain, available loss mitigation options, if any, offered by or through the borrower's mortgage servicer, such as loan modifications or other alternatives to foreclosure." (Cal. Civ. Code § 2923.4.)

45.     One of the most important aspect of HBOR is that it prohibits "dual tracking," which occurs when a bank forecloses on a loan while negotiating with the borrower to avoid foreclosure. (Cal. Civ. Code § 2923.6.) HBOR provides for injunctive relief for statutory violations that occur prior to foreclosure (Cal. Civ. Code § 2924.12, subd. (a)), and monetary damages when the borrower seeks relief for violations after the foreclosure sale has occurred. (Cal. Civ. Code § 2924.12, subd. (b).).

46.     Under HBOR, both large and small servicers are prevented from moving forward with foreclosures—through recording a notice of default, notice of trustee sale, or by conducting the sale itself—while a complete, first lien loss mitigation application is pending.  Basically, the servicer must provide a written denial and wait for an appeal period to expire before moving forward with foreclosure.

47.     The mortgage loan that was secured by Mr. and Mrs. Medina's home (the "mortgage loan") was a first lien on an owner-occupied, one-to-four unit property, as defined by Cal. Civ. Code § 2924.15(a). The home was Mr. and Mrs.

Medina's principal residence. Defendant Wells Fargo conducts more than 175 foreclosures on residential properties with four dwelling units or less, thus Wells Fargo is not a "small" servicer as defined by HBOR. Thus, Defendants are subject to the provisions of the Homeowners Bill of Rights.

48.     Mr. and Mrs. Medina assert claims for relief against Defendants for violations of the specific rules set forth in the Homeowners Bill of Rights, as set forth *infra*.

49.     Mr. and Mrs. Medina assert a private right of action under HBOR pursuant to Cal. Civ. Code § 2924.12, and any such action provides for remedies including actual damages, costs, statutory damages, and attorneys' fees.

## VI.  BACKGROUND -- CFPB AND OTHER LITIGATION AGAINST DEFENDANT WELLS FARGO

50.     The Consumer Financial Protection ("CFPB") is well aware that Defendant Wells Fargo has years of widespread errors and illegal conduct when it comes to the servicing mortgage loans. Furthermore, Wells Fargo has been the subject of numerous lawsuits directly relating to the reckless and improper handling of loss mitigation applications.

51.     In 2018, the CFPB announced a settlement with Wells Fargo Bank, N.A. in a coordinated action with the Office of the Comptroller of the Currency (OCC). As described in the consent order, the Bureau found that Wells Fargo

violated the Consumer Financial Protection Act (CFPA) in the way it charged certain borrowers for mortgage interest rate-lock extensions. The CFPB assessed a $1 billion penalty against the bank and credited the $500 million penalty collected by the OCC toward the satisfaction of its fine.

52.     In 2015, the Consumer Financial Protection Bureau (CFPB) and the Maryland Attorney General took action against Wells Fargo and JPMorgan Chase for an illegal marketing-services-kickback scheme they participated in with Genuine Title, a now-defunct title company. The consent orders, filed in federal court, required $24 million in civil penalties from Wells Fargo, $600,000 in civil penalties from JPMorgan Chase, and $11.1 million in redress to consumers whose loans were involved in this scheme.

53.     Furthermore, in 2018, in the matter of *Alicia Hernandez et al. v. Wells Fargo Bank, N.A.,* in the Northern District of California, with case no. 3:2018-cv-07354, a class-action complaint was filed against Defendant Wells Fargo alleging that Wells Fargo wrongfully denied federally-required mortgage modifications to borrowers in trouble. Wells Fargo has acknowledged that 870 borrowers were wrongfully denied a modification, and that more than 500 borrowers lost their homes as a result, but Wells Fargo blames the issue on a series of calculation errors, according to the lawsuit.  The matter is still being litigated.

54.    On April 12, 2019 in the matter of *Justo Reyes, et al. v. Wells Fargo Bank, N.A.* in the United States Bankruptcy Court for the Southern District of New York, with Case No. 19-ap-08249-rdd, a class action complaint was filed against Defendant Wells Fargo alleging that Wells Fargo wrongfully denied federally-required mortgage modifications and/or private-label approved mortgage modifications after Borrowers completed Trial Payment Plans and were wrongfully denied a permanent modification based on Wells Fargo's errors in title searched. Wells Fargo has acknowledged the errors by sending letters to affected homeowners along with checks in the amount of $300.00.  Wells Fargo has not acknowledged the amount of affected borrowers.  The matter is still being litigated.

55.    In 2014, in the matter of *Garcia et al. v. Wells Fargo Bank, N.A.*, in the Central District of California, with case no. 8:14-cv-00558, a class action complaint was filed against Defendant Wells Fargo for violations of the Homeowners Bill of Rights, alleging that Wells Fargo practiced "dual tracking" by pursuing foreclosures while simultaneously processing loan modifications.  The matter was settled.

56.    As outlined above, it is clear that Defendant Wells Fargo has systemically and routinely violated the mortgage servicing and debt collection rules and regulations, specifically as it relates to mortgage servicing and dual tracking. Wells Fargo has exhibited a pattern and practice of systemic misconduct in its

mortgage operations.   Mr. and Mrs. Medina are among those who are directly affected by Wells Fargo's misconduct, in that they lost their home due to Wells Fargo's inability to follow the mortgage servicing rules and regulations.

## VII.  PATTERN AND PRACTICE OF RESPA VIOLATIONS BY DEFENDANT WELLS FARGO

57.    It is clear that Defendant Wells Fargo has engaged in a pattern and practice of mistreating mortgage loan borrowers and violating provisions of RESPA and the regulations promulgated thereunder at Regulation X.   This pattern and practice is evidenced in this case by at least **six (6) distinct violations** as alleged herein.

58.    At the time of the filing of this Complaint, Defendant Wells Fargo has had at least 67,979 consumer complaints lodged against it nationally, specifically concerning the issues identified on the CFPB's consumer complaint database, at least 36,366 such complaints identified on the CFPB's consumer complaint database as "mortgage," and at least 17,368 such complaints identified as "loan modification, collection, foreclosure."  Each such complaint is filed and cataloged in the CFPB's publicly       accessible       online       database,       which       is       located       at: https://www.consumerfinance.gov/data-research/consumer-complaints/search/?from=0&searchField=all&searchText=wells%20fargo&size=25 &sort=created_date_desc

# VIII.  FACTUAL ALLEGATIONS

### A.    Mr. and Mrs. Medina's Experience with Wells Fargo

59.    Mr. and Mrs. Medina's experience included many of the mortgage servicing failures identified in both the CFPB and HBOR preambles.

60.    Mr. and Mrs. Medina are husband and wife who purchased the Property located in Temecula, CA in or about July 2005 for approximately $455,000.00 with two mortgage loans: a first deed of trust for approximately $364,000.00 and a second deed of trust for approximately $45,500.00.  Defendant Wells Fargo was the lender and the servicer of both of Mr. and Mrs. Medina's mortgage loans.

61.    Around 2011, Mr. and Mrs. Medina struggled to pay their mortgage, and in August of 2011, Mr. and Mrs. Medina obtained a temporary loan modification for the period of time beginning September 1, 2011 through July 1, 2015.  The arrears of $14,517.80 were deferred as a secondary principle balance.  During the time of the loan modification, payments were $1,777.55.   Then starting July 1, 2015 payments were to increase to around $2,696.12.

62.    Starting around 2014, Mr. and Mrs. Medina experienced personal and financial hardships that caused them to fall behind on their payments and to default on their mortgage loans.  Mrs. Medina's mother became terminally ill and required care.   Further, Mrs. Medina became unemployed due to an injury to her right shoulder that she sustained at her job, and her income was significantly reduced.

**FIRST AMENDED COMPLAINT**

63. In or about July 2015, Mr. and Mrs. Medina obtained a loan through a government program with CalHFA Mortgage Assistance Corporation (the "Keep Your Home California Program."). Mr. and Mrs. Medina used the loan to pay all of their arrears and bring the loan current. The terms of the loan were that the loan would be 100% forgiven on the 5th Anniversary of the Note.

64. Despite their best efforts, starting in early 2017, Mr. and Mrs. Medina again fell behind on their mortgage loans, and fell into default. Mr. Medina became unemployed in about April 2017, and Mrs. Medina was still unable to work due to her injury. Now that Mr. Medina was unemployed, they suddenly were unable to pay their mortgage loans. On top of which, the mortgage payment had increased to almost $1,000.00 more (from $1,777.55 to $2,696.12) since the temporary loan modification had terminated in July 2015.

65. Around June 2017, Wells Fargo initiated foreclosure proceedings against Mr. and Mrs. Medina's home and Wells Fargo recorded a Notice of Default.

66. On or about August 17, 2017, Mrs. Medina contacted Wells Fargo by telephone to see if Wells Fargo could offer some form of assistance as she had received in the past. In a letter dated August 17, 2017, the Home Preservation Department for Wells Fargo Home Mortgage confirmed the telephone call and that they were unable to reach a "mutual agreement," and requested that Mrs. Medina contact Wells Fargo to discuss options to assist Mr. and Mrs. Medina. However, the

**FIRST AMENDED COMPLAINT**

letter did not designate a person for Mr. and Mrs. Medina to contact, or a direct telephone number to a person at Wells Fargo for Mr. and Mrs. Medina to call.

67.     On or about September 19, 2017, Mrs. Medina again contacted Wells Fargo by telephone for assistance.  In a letter dated September 19, 2017, the Home Preservation Department for Wells Fargo Home Mortgage confirmed the telephone call and they were unable to reach a "mutual agreement," and requested that Mrs. Medina contact Wells Fargo to discuss options.  However, the letter did not designate a person for Mr. and Mrs. Medina to contact, or a direct telephone number to a person at Wells Fargo for Mr. and Mrs. Medina to call.

68.     Due to Mr. and Mrs. Medina's inability to obtain assistance through Wells Fargo, a Notice of Trustee Sale was recorded on or about October 2, 2017 setting a sale date of Mr. and Mrs. Medina's home for November 2, 2017.

69.     Mrs. Medina again contacted Wells Fargo, and Wells Fargo agreed to send to Mr. and Mrs. Medina an application for a loss mitigation alternative.  Around this same time, Wells Fargo postponed the sale date of Mr. and Mrs. Medina's home indefinitely.

70.     It was not until November 2017 that Wells Fargo sent a loss mitigation application to Mr. and Mrs. Medina.  In a letter dated November 7, 2017, Andrew De Leon, Home Preservation Specialist for Wells Fargo was designated at Mr. and Mrs. Medina's point of contact.  In the letter, Andrew De Leon requested

that Mr. and Mrs. Medina complete the forms and submit the required documents by December 7, 2017 in order to be considered for a loan modification, or other loss mitigation options.   Mr. and Mrs. Medina immediately submitted a complete loss mitigation application for a foreclosure prevention alternative ("application") and all required documents to Wells Fargo with the hopes that Wells Fargo would grant them another temporary modification, as they had done in the past.

71.    Wells Fargo did not send Mr. and Mrs. Medina written notification of whether their application was complete or incomplete.  Wells Fargo did not provide a determination on Mr. and Mrs. Medina's application until January 22, 2018.   In a letter dated January 22, 2018, from Wells Fargo Home Mortgage, Wells Fargo did not approve Mr. and Mrs. Medina for a temporary loan modification or other option that would enable Mr. and Mrs. Medina to keep her home; rather, the letter stated that Wells Fargo approved Mr. and Mrs. Medina for a short sale.

72.    In a letter dated January 24, 2018, Andrew J. Deleon, Home Preservation Specialist stated that, based on the review of documents provided, Wells Fargo was unable to create an affordable mortgage payment that met the requirements of their temporary loan modification program, and that this decision was reached by reviewing Mr. and Mrs. Medina's monthly gross income, which was calculated at the time as $2,807.68.    Wells Fargo's letter stated that Mr. and Mrs. Medina can appeal the decision by March 1, 2018.

**FIRST AMENDED COMPLAINT**

73.     Wells Fargo closed their review of Mr. and Mrs. Medina's application on or about March 15, 2018 and proceeded with foreclosure proceedings.  A Notice of Trustee Sale date was set to sell Mr. and Mrs. Medina's home on May 10, 2018.

74.     Shortly thereafter, in about March 2018, Mr. Medina obtained full-time employment and their financial situation substantially and materially changed.  Mrs. Medina called Wells Fargo to see what her options were now that there was a material change in financial circumstances since the gross household income had doubled.  In this telephone call, Wells Fargo told Mrs. Medina that if Mr. and Mrs. Medina could show a monthly income closer to $5,500 a month, they would qualify for a temporary or permanent loan modification.  Wells Fargo told Mr. and Mrs. Medina to wait two (2) months before submitting a new application as Wells Fargo stated they needed several paystubs to verify the new monthly income.

75.     Mr. and Mrs. Medina waited the two months, and on or about May 1, 2018, Ms. Medina faxed the new complete application directly to Andrew De Leon, in Home Preservation at Wells Fargo.  The new application detailed their material change in financial circumstances with documentation to substantiate the increase in income, which was now around $5,500.00.  Mr. and Mrs. Medina were hopeful that now they would qualify for a foreclosure alternative, such as for a first lien modification, that would enable them to keep their home since Wells Fargo had told Mrs. Medina that a monthly income of $5,500.00 would be enough for Mr. and Mrs.

**FIRST AMENDED COMPLAINT**

Medina to qualify for a temporary or permanent loan modification.  Mr. and Mrs. Medina supplied Well Fargo will all the documents required by Wells Fargo within the timeframe specified by Wells Fargo.  Mr. and Mrs. Medina faxed the application more than nine (9) days (and seven (7) business days) before the May 10, 2018 sale date set for her home

76.    Around this same time, Mrs. Medina contacted CalHFA to see if Mr. and Mrs. Medina would qualify for another government assisted loan to pay their arrears.  CalHFA informed Mrs. Medina over the telephone that they qualified for a loan through the Keep Your Home, California Program, and started the process of preparing the paperwork for the loan.

77.    In a letter dated May 4, 2018, Amy Wachter, Senior Vice President of Wells Fargo Home Lending, acknowledged receipt of Mr. and Mrs. Medina's application, and stated that it is Wells Fargo's "goal to complete the necessary research and provide [Mr. and Mrs. Medina] with a response by May 17, 2018," seven days after the date set for the sale of Mr. and Mrs. Medina's home.   The letter failed to designate a single point of contact for Mr. and Mrs. Medina to contact regarding the review of their application.

78.    Mrs. Medina telephoned Wells Fargo and pleaded for the sale date to be postponed while her and her husband's application was under review.  Mrs. Medina also informed Wells Fargo that she had qualified for a loan through CalHFA

**FIRST AMENDED COMPLAINT**

to re-pay her arrears.  Mrs. Medina informed Wells Fargo that they needed just a few weeks for the paperwork on the CalHFA loan to be processed and finalized.

**79.    However, Wells Fargo refused to postpone the sale date to allow for Mr. and Mrs. Medina to obtain the documents and finalize the loan through CalHFA.   Further, even though Wells Fargo was in receipt of and was still reviewing a complete application, Wells Fargo continued to foreclose on Mr. and Mrs. Medina's home and refused to postpone the sale date even while their complete application was still under review**.

80.    On or about May 10, 2018, despite Mr. and Mrs. Medina's application still being under review, Mr. and Mrs. Medina's home was sold and purchased at auction.

81.    In a letter dated May 17, 2018, seven days after their home was sold, Mr. and Mrs. Medina received a letter from Brayden Murray, Executive Resolution Specialist for Customer Care and Recovery Group at Wells Fargo stating that "[w]e now expect to complete our work by June 1, 2018" and had not yet made a final determination on her loss mitigation application.   The letter stated that Brayden Murray could be reached directly.

82.    In a letter dated June 18, 2018, more than a month after their house was sold at auction, Mr. and Mrs. Medina received a letter from a different employee, Timothy Bolten, Executive Resolution Specialist for Customer Care and Recovery

Group at Wells Fargo, stating that "[w]e now expect to complete our work by June 29, 2018" and had not yet made a final determination on her loss mitigation application. The letter stated that Timothy Bolten could be reached directly. On that same day, on June 18, 2019, an unlawful detainer was filed to evict Mr. and Mrs. Medina from their family home.

83. A month and half after the date Wells Fargo told Mr. and Mrs. Medina they would respond to her application, and **almost two (2) months after her home was sold at auction**, Mr. and Mrs. Medina received a letter dated June 29, 2018 from Brayden Murray, Executive Resolution Specialist for Customer Care and Recovery Group, regarding request for foreclosure postponement. Mr. Murray stated that he had reviewed the new request for assistance based on new monthly income of $5,659.00, but that the increase in income was "still not large enough change to consider a new review, thus unable to postpone foreclosure sale date." Further, Mr. Murray stated that "we did not receive notice of approval from the Keep Your Home California Program." Mr. Murray's letter suggests that Wells Fargo expected the Keep You Home California Program to provide documents approving a mortgage loan *after* the property had been already foreclosed and sold, even though Wells Fargo's refusal to postpone the sale date by as little as a few weeks would have allowed the time necessary for Mr. and Mrs. Medina to obtain the necessary

documentation from CalHFA, and was the sole reason for Mr. and Mrs. Medina's inability to obtain the documentation from CalHFA.

84.    Mr. and Mrs. Medina have suffered extreme emotional distress and mental anguish as a direct result of her experience with Wells Fargo.  Wells Fargo's actions in aggressively pursuing foreclosure while Mr. and Mrs. Medina's loss mitigation application was under review caused Mr. and Mrs. Medina to suffer severe anxiety, emotional distress and mental anguish. Mrs. Medina had a nervous and mental breakdown and was hospitalized as a direct result of her experience with Wells Fargo.  Wells Fargo's actions have also caused Mr. and Mrs. Medina to suffer the irreparable harm of losing their home, a home that they can never get back.  Due to Wells Fargo's actions, Mr. and Mrs. Medina has also incurred attorneys fees and costs to bring this lawsuit.

**B.    Request for Information ("RFI") #1**

85.    On or about September 28, 2018, Mr. and Mrs. Medina, through their counsel, sent to Wells Fargo a Request for Information letter ("RFI #1") pursuant to 12 C.F.R. § 1024.36 by certified mail to the address designated by Wells Fargo on its website for the receipt of Request for Information letters, that address being: P.O. Box 10335, Des Moines, IA 50306-0335.  RFI #1 requested information related to the servicing of Mr. and Mrs. Medina's mortgage loan and their loss mitigation applications.

**FIRST AMENDED COMPLAINT**

86.     RFI #1 was delivered to Wells Fargo on or about October 4, 2018.

87.     In a letter dated October 4, 2018, Wells Fargo acknowledged it had received RFI #1.

88.     In a letter dated October 19, 2018, Wells Fargo stated that a response will be provided to RFI #1 by November 2, 2018.

89.     In a letter dated November 2, 2018, Wells Fargo stated that it sent its response to RFI #1 directly to Mr. and Mrs. Medina. However, Mr. and Mrs. Medina did not receive a response dated on or about November 2, 2018.

90.     In a letter dated January 7, 2018, over three-and-a-half months after receiving RFI #1, Wells Fargo provided a response to RFI #1**.  However, the response did not provide any of the information requested.**  The response also did not include a statement that Wells Fargo had conducted a reasonable search for the requested information, nor a written notification that Wells Fargo had determined that the requested information was not available.

C.     **Request for Information ("RFI") #2**

91.     On or about December 10, 2018, Mr. and Mrs. Medina, through their counsel, sent to Wells Fargo a Request for Information letter ("RFI #2") pursuant to 12 C.F.R. § 1024.36 by certified mail to the address designated by Wells Fargo on its website for the receipt of Request for Information letters, that address being: P.O.

Box 10335, Des Moines, IA 50306-0335.  RFI #1 requested information related to the servicing of Mr. and Mrs. Medina's mortgage loan.

92.     RFI #2 was delivered to Wells Fargo on or about December 17, 2018.

93.     In a letter dated December 18, 2018, Wells Fargo acknowledged it had received RFI #2.

94.      In a letter dated January 2, 2019, Wells Fargo stated that a response will be provided to RFI #2 by January 16, 2019.

95.      To this date, neither Mr. and Mrs. Medina, nor their counsel, have received a response to RFI #2.

**D.     Notice of Error ("NOE") #1**

96.      On or about January 28, 2019, Mr. and Mrs. Medina, through their counsel, sent to Wells Fargo a Notice of Error letter ("NOE #1") pursuant to 12 C.F.R. § 1024.36 by certified mail to the address designated by Wells Fargo on its website for the receipt of Request for Information letters, that address being: P.O. Box 10335, Des Moines, IA 50306-0335.  NOE #1 related to the servicing of Mr. and Mrs. Medina's mortgage loan and Wells Fargo's failure to respond to RFI #1 and RFI #2.

97.      NOE #1 was delivered to Wells Fargo on or about January 30, 2019.

98.      In a letter dated January 30, 2019, Wells Fargo stated that they had

1
2

received NOE #1 on January 30, 2019 and would provide a response by February 13, 2019.

3
4
5
6
7
8
9
10
11
12
13

99.      In a letter dated February 4, 2019, Wells Fargo provided a response to NOE #1.  However, the response did not correct most of the errors identified in NOE #1 with written notification of the correction, and the effective date of the correction, nor include a statement that Wells Fargo had determined that no error occurred, a statement of the reason or reasons for this determination, and a statement of the Mr. and Mrs. Medina's right to request documents relied upon by Wells Fargo in reaching its determination, with information regarding how Mr. and Mrs. Medina can request such documents.

14
15
16
17
18

## IX.  CAUSES OF ACTION

### FIRST CAUSE OF ACTION
**12 C.F.R. § 1024.36(d)**
**(Against all Defendants)**
**(Failure to timely respond to RFI #1)**

19
20

100.      Mr. and Mrs. Medina re-allege each and every allegation above, as if fully set forth in this Cause of Action.

21
22
23
24
25
26
27

101.      12 C.F.R. § 1024.36(a) provides that "[a] servicer shall comply with the requirements of this section for any written request for information from a borrower that includes the name of the borrower, information that enables the servicer to identify the borrower's mortgage loan account, and states the information the borrower is requesting with respect to the borrower's mortgage loan."

28

102.     Comment 1 of the CFPB's Official Interpretations of 12 C.F.R. § 1024.36(a) provides that "[a]n information request is submitted by a borrower if the information request is submitted by an agent of borrower."

103.     12 C.F.R. § 1024.36(d)(1) provides that a servicer must respond to a request for information by either "[p]roviding the borrower with the requested information and contact information, including a telephone number, for further assistance in writing" or "[c]onducting a reasonable search for the requested information and providing the borrower with a written notification that states that the servicer has determined that the requested information is not available to the servicer, provides the basis for the servicer's determination, and provides contact information, including a telephone number, for further assistance."

104.     12 C.F.R. § 1024.36(c) provides that: "Within five days (excluding legal public holidays, Saturdays, and Sundays) of a servicer receiving an information request from a borrower, the servicer shall provide to the borrower a written response acknowledging receipt of the information request.

105.     Furthermore, 12 C.F.R. § 1024.36(d)(2)(i) provides that:

A servicer must comply with the requirements of paragraph (d)(1) of this section:

(A) Not later than 10 days (excluding legal public holidays, Saturdays, and Sundays) after the servicer receives an information request for the identity of, and address or other relevant contact information for, the owner or assignee of a mortgage loan; and

**FIRST AMENDED COMPLAINT**

(B) For all other requests for information, not later than 30 days (excluding legal public holidays, Saturdays, and Sundays) after the servicer receives the information request.

106.    Based on the allegations above, *supra*, RFI #1 sent on September 28, 2018 constituted a request for information pursuant to 12 C.F.R. 1024.36(d)(2)(i)(B).

107.    RFI #1 was related to Wells Fargo's servicing of the Medina's Loan as information regarding loss mitigation is within the definition of servicing as defined by RESPA. *See* 12 U.S.C. § 2605 generally; see also *McClain v. CitiMortgage, Inc.*, 2016 WL 269568 (NDIL 2016); see also *Yepez v. Specialized Loan Servicing, LLC*, Case No. 18-cv-07422, *Memorandum Opinion and Order*, (NDIL June 27, 2019, J. Leinenweber); see also *Catalan v. GMAC Mortg. Corp*, 629 F. 3d 676 (7th Cir. 2011).

108.    RFI #1 was delivered to the address designated by Wells Fargo as the address to receive requests for information on October 4, 2018.

109.    Pursuant to 12 C.F.R. § 1024.36(d)(2)(i), Defendant Wells Fargo was required to respond and provide the information requested within thirty (30) business days of receipt on October 4, 2018, by on or about Thursday, November 15, 2018.

110.    **Defendant Wells Fargo did not provide a response to Mr. and Mrs. Medina's RFI #1 until January 7, 2019**, almost two months after the date that Wells Fargo's response was due.

111.    Defendant's actions in failing to provide a written response to

**FIRST AMENDED COMPLAINT**

RFI #1 within thirty (30) days in compliance with the requirements of 12 C.F.R. § 1024.36(d)(2)(i), constitutes a willful violation of 12 C.F.R. § 1024.36(d)(2)(i).

112.   Defendant's actions are believed to be a pattern and practice of behavior in conscious disregard for Mr. and Mrs. Medina's rights.

113.   Further, in its letter dated January 7, 2019, **Wells Fargo failed to provide Mr. and Mrs. Medina with any of the information requested** as required by 12 C.F.R. 1024.36(d)(1).

114.   The response did not include a statement that Wells Fargo had conducted a reasonable search for the requested information, nor a written notification that Wells Fargo determined that the requested information was not available, as required by 12 C.F.R. 1024.36(d)(1).

115.   Defendant's actions in failing to provide the information requested in RFI #1 in compliance with the requirements of 12 C.F.R. § 1024.36(d)(1), constitutes a willful violation of 12 C.F.R. § 1024.36(d)(1).

116.   Defendant's actions are believed to be a pattern and practice of behavior in conscious disregard for Mr. and Mrs. Medina's rights.

117.   As a result of Defendant Wells Fargo's actions, Defendant Wells Fargo is liable to Mr. and Mrs. Medina for actual damages, as described, *supra*, as well as for statutory damages per each violation of RESPA based on each

**FIRST AMENDED COMPLAINT**

Defendant's pattern and practice of noncompliance with the requirements of this section, costs, and attorneys' fees related to the prosecution of this action.

## SECOND CAUSE OF ACTION
### 12 C.F.R. § 1024.36(d)
### (Against all Defendants)
### (Failure to respond to RFI #2)

118.   Mr. and Mrs. Medina re-allege each and every allegation above, as if fully set forth in this Cause of Action.

119.   12 C.F.R. § 1024.36(a) provides that "[a] servicer shall comply with the requirements of this section for any written request for information from a borrower that includes the name of the borrower, information that enables the servicer to identify the borrower's mortgage loan account, and states the information the borrower is requesting with respect to the borrower's mortgage loan."

120.   Comment 1 of the CFPB's Official Interpretations of 12 C.F.R. § 1024.36(a) provides that "[a]n information request is submitted by a borrower if the information request is submitted by an agent of borrower."

121.   12 C.F.R. § 1024.36(d)(1) provides that a servicer must respond to a request for information by either "[p]roviding the borrower with the requested information and contact information, including a telephone number, for further assistance in writing" or "[c]onducting a reasonable search for the requested information and providing the borrower with a written notification that states that the servicer has determined that the requested information is not available to the servicer,

provides the basis for the servicer's determination, and provides contact information, including a telephone number, for further assistance."

122.   12 C.F.R. § 1024.36(c) provides that: "Within five days (excluding legal public holidays, Saturdays, and Sundays) of a servicer receiving an information request from a borrower, the servicer shall provide to the borrower a written response acknowledging receipt of the information request.

123.   Furthermore, 12 C.F.R. § 1024.36(d)(2)(i) provides that:

> A servicer must comply with the requirements of paragraph (d)(1) of this section:
>
> (A) Not later than 10 days (excluding legal public holidays, Saturdays, and Sundays) after the servicer receives an information request for the identity of, and address or other relevant contact information for, the owner or assignee of a mortgage loan; and
>
> (B) For all other requests for information, not later than 30 days (excluding legal public holidays, Saturdays, and Sundays) after the servicer receives the information request.

124.   Based on the allegations above, *supra*, RFI #2 sent on December 10, 2018, constituted a request for information pursuant to 12 C.F.R. 1024.36(d)(2)(i)(B).

125.   RFI #2 was related to Wells Fargo's servicing of the Medina's Loan as information regarding loss mitigation is within the definition of servicing as defined by RESPA. *See* 12 U.S.C. § 2605 generally; see also *McClain*

*v. CitiMortgage, Inc.*, 2016 WL 269568 (NDIL 2016); see also *Yepez v. Specialized Loan Servicing, LLC*, Case No. 18-cv-07422, *Memorandum Opinion and Order*, (NDIL June 27, 2019, J. Leinenweber); see also *Catalan v. GMAC Mortg. Corp*, 629 F. 3d 676 (7th Cir. 2011).

126.   RFI #2 was delivered to the address designated by Wells Fargo as the address to receive requests for information on December 17, 2018.

127.   Pursuant to 12 C.F.R. § 1024.36(d)(1), Defendant Wells Fargo was required to respond and provide the information requested within thirty (30) business days of receipt on December 17, 2018, by on or about Wednesday, January 23, 2019.

128.   In a letter dated January 2, 2019, Wells Fargo stated that a response will be provided by January 16, 2019.

129.   **However, to this date, neither Mr. and Mrs. Medina nor their counsel have received a response from Wells Fargo to RFI #2.**

130.   Defendant's actions in failing to respond to RFI #2 within thirty (30) days in compliance with the requirements of 12 C.F.R. § 1024.36(d)(2)(i), constitutes a willful violation of 12 C.F.R. § 1024.36(d)(2)(i).

131.   Further, Wells Fargo has failed to conduct a reasonable search for the requested documents, as required by 12 C.F.R. § 1024.36(d)(1).

132.   Defendant's actions in failing to conduct a reasonable search for the

**FIRST AMENDED COMPLAINT**

requested documents in response to RFI #2 in compliance with the requirements of 12 C.F.R. § 1024.36(d)(1), constitutes a willful violation of 12 C.F.R. § 1024.36(d)(1).

133.   Defendant's actions are believed to be a pattern and practice of behavior in conscious disregard for Mr. and Mrs. Medina's rights.

134.   As a result of Defendant Wells Fargo's actions, Defendant Wells Fargo is liable to Mr. and Mrs. Medina for actual damages, as described, *supra*, as well as for statutory damages per each violation of RESPA based on each Defendant's pattern and practice of noncompliance with the requirements of this section, costs, and attorneys' fees.

## THIRD CAUSE OF ACTION
### 12 C.F.R. § 1024.35(e)(1)
### (Against all Defendants)
### (Failure to respond to NOE #1)

135.   Mr. and Mrs. Medina re-allege each and every allegation above, as if fully set forth in this Cause of Action.

136.   12 C.F.R. § 1024.35(a) provides "[a] servicer shall comply with the requirements of this section for any written notice from the borrower that asserts an error and that includes the name of the borrower, information that enables the servicer to identify the borrower's mortgage loan account, and the error the borrower believes has occurred."

137.     12 C.F.R. § 1024.35(d) provides that a servicer must acknowledge in writing receiving a notice of error from a borrower within five days of receipt.

138.     12 C.F.R. § 1024.35(a) provides "[a] servicer shall comply with the requirements of this section for any written notice from the borrower that asserts an error and that includes the name of the borrower, information that enables the servicer to identify the borrower's mortgage loan account, and the error the borrower believes has occurred."

139.   Comment 1 of the CFPB's Official Interpretations of 12 C.F.R. §1024.35(a) provides that "[a] notice of error is submitted by a borrower if the notice of error is submitted by an agent of the borrower."

140.   12 C.F.R. § 1024.35(e)(1) provides that a servicer must respond to a notice of error by either "[c]orrecting the error or errors identified by the borrower and providing the borrower with a written notification of the correction, the effective date of the correction, and contact information, including a telephone number, for further assistance" or "[c]onducting a reasonable investigation and providing the borrower with a written notification that includes a statement that the servicer has determined that no error occurred, a statement of the reason or reasons for this determination, a statement of the borrower's right to request documents relied upon by the servicer in reaching its determination, information regarding how the borrower

**FIRST AMENDED COMPLAINT**

can request such documents, and contact information, including a telephone number, for further assistance."

141.  12 C.F.R. § 1024.35(e)(3)(i) provides that "a servicer must comply with the requirements of paragraph (e)(1) …not later than 30 days (excluding legal public holidays, Saturdays, and Sundays) after the servicer receives the applicable notice of error."

142.  12 C.F.R. § 1024.35(b)(11) provides that it is an error under 12 C.F.R. § 1024.35 for a servicer to commit any error in the servicing of a borrower's mortgage loan not specifically identified otherwise in 12 C.F.R. § 1024.35.

143.  Based on the allegations above, *supra*, NOE #1 sent on January 28, 2019, constituted a Notice of Error pursuant to 12 C.F.R. 1024.35(a).

144.  As alleged above, on January 28, 2019, Mr. and Mrs. Medina sent NOE #1 to Wells Fargo to the address designated by Wells Fargo as the address to receive Notice of Errors letters, and NOE #1 was delivered to Wells Fargo on January 30, 2019.

145.  NOE #1 notified Wells Fargo of specific errors that the Medinas believed to have occurred pursuant to 12 C.F.R. § 1024.35(b)(7) which encompasses errors related to "failure to provide accurate information to a borrower regarding loss mitigation and foreclosure." 12 C.F.R. § 1024.35(b)(7); see also 12 C.F.R. § 1024.39(b)(iv).

146.   Pursuant to 12 C.F.R. § 1024.35(e), Defendant Wells Fargo was required to send a response to Mr. and Mrs. Medina, either correcting its error or asserting that no error occurred and the reason for such determination, within thirty (30) business days of receipt of the NOE #1.

147.   As Defendant received NOE #1 on January 30, 2019, Defendant Wells Fargo had until on or about Thursday, March 14, 2019 to provide a substantive response to NOE #1

148.   In a letter dated February 4, 2019, Wells Fargo responded to NOE #1. However, Defendant's response to NOE #1 on or about February 4, 2019 is insufficient in that it neither corrects the errors addressed in NOE #1, nor provides a statement that Wells Fargo has determined no error has occurred with a statement of the reason or reasons for this determination.

149.   Defendant's actions in failing to respond to NOE #1 in compliance with the requirements of 12 C.F.R. § 1024.35(e)(1), constitutes a willful violation of 12 C.F.R. § 1024.35(e)(1).

150.   Defendant's actions in failing to provide a sufficient response to NOE #1 constitutes a clear, distinct, and separate violation of 12 C.F.R. 1024.35(e)(1) for each insufficient response Wells Fargo has failed to send.

151.   Defendant Wells Fargo's actions are believed to be a pattern and practice of behavior in conscious disregard for Mr. and Mrs. Medina's rights.

152.   As a result of Defendant Wells Fargo's actions, Defendant is liable to Mr. and Mrs. Medina for actual damages, as described, supra, as well as for statutory damages per each violation of RESPA, based on Defendant's pattern and practice of noncompliance with the requirements of this section, costs, and attorneys' fees related to the preparation and review of NOE #1 and related to the prosecution of this action.

**FOURTH CAUSE OF ACTION**
**Homeowners Bill of Rights ("HBOR")**
**California Civil Code § 2920, et seq.**
**(Against all Defendants)**

153.   Mr. and Mrs. Medina re-allege each and every allegation above, as if fully set forth in this Cause of Action.

154.   The Homeowners Bill of Rights ("HBOR") prohibits a mortgage servicer, mortgagee, trustee, beneficiary or authorized agent from recording a notice of default, notice of trustee sale, or conducting a trustee's sale while a borrower's complete first lien loss mitigation application for a foreclosure prevention alternative, such as for a first lien loan modification ("application") is pending.  Cal. Civ. Code § 2923.6(c).   Further, HBOR provides that a borrower shall have thirty (30) days to appeal the denial of an application.  Cal. Civ. Code § 2923.6(d).

155.   Pursuant to Cal. Civ. Code § 2923.6, if a borrower submits a complete application for a first lien loan modification at least five (5) business days before a scheduled foreclosure sale, a lender or servicer cannot record a notice of

**FIRST AMENDED COMPLAINT**

sale or conduct a trustee's sale while the application is pending.  Cal. Civ. Code §

2923.6(c) states:

> **"(c)** If a borrower submits a complete application for a first lien loan modification offered by, or through, the borrower's mortgage servicer at least five business days before a scheduled foreclosure sale, a mortgage servicer, mortgagee, trustee, beneficiary, or authorized agent shall not record a notice of default or notice of sale, or conduct a trustee's sale, while the complete first lien loan modification application is pending. A mortgage servicer, mortgagee, trustee, beneficiary, or authorized agent shall not record a notice of default or notice of sale or conduct a trustee's sale until any of the following occurs:
> **(1)** The mortgage servicer makes a written determination that the borrower is not eligible for a first lien loan modification, and any appeal period pursuant to subdivision (d) has expired.
> **(2)** The borrower does not accept an offered first lien loan modification within 14 days of the offer.
> **(3)** The borrower accepts a written first lien loan modification, but defaults on, or otherwise breaches the borrower's obligations under, the first lien loan modification."

156.   Pursuant to Cal. Civ. Code § 2923.6(h), an application is considered complete when the borrower submits all documents required by the lender or servicer, within a reasonable time frame.  Cal. Civ. Code § 2923.6(h) states: "For purposes of this section, an application shall be deemed "complete" when a borrower has supplied the mortgage servicer with all documents required by the mortgage servicer within the reasonable timeframes specified by the mortgage servicer."

157.   Pursuant to Cal. Civ. Code § 2924.12, if a servicer violates Cal. Civ.

Code § 2923.6, the homeowner can enforce a private right of action.  If the servicer conducts a foreclosure sale of the home and records a trustee's deed upon sale, the homeowner can ask for a statutory fee of $50,000.00, attorney's fees and actual damages.  Cal. Civ. Code § 2924.12(b) states:

> "(b) After a trustee's deed upon sale has been recorded, a mortgage servicer, mortgagee, trustee, beneficiary, or authorized agent shall be liable to a borrower for actual economic damages pursuant to Section 3281, resulting from a material violation of Section 2923.55, 2923.6, 2923.7, 2924.9, 2924.10, 2924.11, or 2924.17 by that mortgage servicer, mortgagee, trustee, beneficiary, or authorized agent where the violation was not corrected and remedied prior to the recordation of the trustee's deed upon sale. If the court finds that the material violation was intentional or reckless, or resulted from willful misconduct by a mortgage servicer, mortgagee, trustee, beneficiary, or authorized agent, the court may award the borrower the greater of treble actual damages or statutory damages of fifty thousand dollars ($50,000)."

158.    As alleged above, Mr. and Mrs. Medina were told by Wells Fargo to submit an application for a first lien loan modification when Mr. Medina received two months of paystubs.  Thus, Mr. and Mrs. Medina submitted an application within the time frame specified by Wells Fargo.  In accordance with the instructions from Wells Fargo, Mr. and Mrs. Medina submitted a complete application to Wells Fargo on or about May 1, 2018, nine (9) days and seven (7) business days before the sale date of Mr. and Mrs. Medina's home on May 10, 2018.  On May 1, 2018, Mr. and

Mrs. Medina faxed the complete application and all documents required by Wells Fargo directly to Andrew De Leon, in Home Preservation at Wells Fargo.  Thus, Wells Fargo received a complete application on or about May 1, 2018, seven (7) business days before the sale on May 10, 2018.

159.     Mr. and Mrs. Medina supplied Well Fargo with all the documents required by Wells Fargo by May 1, 2018 within the timeframe specified by Wells Fargo since Wells Fargo instructed Mr. and Mrs. Medina to wait two (2) months before submitting an application.

160.     In a letter dated May 4, 2018, Wells Fargo acknowledged it had received a complete application and that the application was under review.

161.     However, Wells Fargo conducted a sale of Mr. and Mrs. Medina's home on May 10, 2018 while Mr. and Mrs. Medina's complete application was pending review, and before making a final written determination on Mr. and Mrs. Medina's complete application.

162.     Wells Fargo violated Cal. Civ. Code § 2923.6(c) when it conducted a foreclosure sale of Mr. and Mrs. Medina's home while Wells Fargo was in receipt of a complete first lien loan modification application that was still pending review, and prior to a final determination on the application.  Wells Fargo further violated Cal. Civ. Code § 2923.6(c) when it recorded a trustee's deed upon sale while a complete application was in receipt by Wells Fargo and still pending review.  Wells

**FIRST AMENDED COMPLAINT**

Fargo further violated Cal. Civ. Code § 2923.6(d) by recording a trustee's deed upon sale without first providing Mr. and Mrs. Medina thirty (30) days to appeal a denial.

163.     Wells Fargo's violations of Cal. Civ. Code §§ 2923.6(c) and (d)  as alleged herein were material violations of Cal. Civ. Code § 2923.6, and were intentional, reckless and/or willful.

164.     As a direct and proximate result of the aforementioned violations, Mr. and Mrs. Medina were harmed in that they suffered the loss of their home, the loss of home equity, relocation costs, loss of opportunity to pursue other strategies to avoid foreclosure, damage to financial reputation, and the financial, credit, and emotional toll of defending against a foreclosure.  Mrs. Medina also suffered severe emotional distress and mental anguish and was hospitalized for a nervous breakdown that she suffered as a direct result of Wells Fargo's unlawful actions in conducting a foreclosure sale on her home while her application was under review, and without providing Mr. and Mrs. Medina the right to appeal the decision to deny their modification prior to conducting the foreclosure sale.

### FIFTH CAUSE OF ACTION
#### "UCL"
#### Cal. Bus. and Prof. Code § 17200 et seq.
#### (Against all Defendants)

165.     Mr. and Mrs. Medina re-allege each and every allegation above, as if fully set forth in this Cause of Action.

166.     Wells Fargo's unlawful, unfair, fraudulent and/or deceptive

business acts and/or practices violated California's Unfair Competition Law, Cal. Bus. and Prof. Code § 17200 et seq. (the "UCL"), which prohibits unlawful unfair, and/or fraudulent business acts and/or practices.

167.     Mr. and Mrs. Medina submitted a complete loss mitigation application to Wells Fargo on or about May 1, 2018, more than nine (9) days before the scheduled date of the foreclosure sale of their home.  However, while the complete loss mitigation application for a first lien loan was pending, and prior to Wells Fargo making a final determination on their application, Wells Fargo conducted a foreclosure sale, sold Mr. and Mrs. Medina's home and recorded a Trustee's Deed Upon Sale, in direct violation of HBOR, Cal. Civil Code § 2924.11.

168.     By engaging in the above-described acts and practices, Wells Fargo has committed one or more acts of unfair competition within the meaning of the UCL.

169.    As a result of Wells Fargo's violations of the HBOR as alleged herein, Mr. and Mrs. Medina have suffered injury and lost money and property, including but not limited to, the loss of her home through Wells Fargo's unfair and unlawful business practices resulting in the loss of home equity and the costs and expenses incurred to fight against the wrongful foreclosure, subsequent eviction, and relocation costs.

170.     <u>Unlawful</u>:  The unlawful acts and practices of Wells Fargo alleged

**FIRST AMENDED COMPLAINT**

above constitute unlawful business acts and/or practices within the meaning of the

UCL.  Wells Fargo's unlawful business act and/or practices as alleged herein have

violated numerous laws, including state and federal statutory laws, and/or common

law – and said predicate acts are therefore per se violations of the UCL.  These

predicate unlawful business acts and/or practices include, but are not limited to,

violations of the Cal. Civil Code § 2924.11 (Ban on Dual-Tracking while loss

mitigation applications are pending),

171.   <u>Unfair</u>:  Wells Fargo's violations of the HBOR as alleged herein

constitute willful, intentional, reckless, negligent and other tortious conduct and

gave Wells Fargo an unfair competitive advantage over their competitors who did

not engage in such practices.  Such misconduct, as alleged herein, also violated

established law and/or public policies which were enacted on January 1, 2013 to

bring fairness, accountability and transparency to the State's mortgage and

foreclosure process and to ensure that as part of California's non-judicial

foreclosure process, borrowers are considered for, and have a meaningful

opportunity to obtain, available loss mitigation options, if any, offered by or

through the borrower's mortgage servicer, such as loan modification or other

alternatives to foreclosure.  Dual-tracking homeowners, such as Mr. and Mrs.

Medina, while a complete loss mitigation application is pending was and is directly

contrary to established legislative goals and policies to promote fairness,

accountability and transparency to the State's mortgage and foreclosure process, and thus Wells Fargo's acts and/or practices alleged herein were and are unfair within the meaning of the UCL.

172.   The harm to Mr. and Mrs. Medina outweighs the utility, if any, of Wells Fargo's acts and/or practices as alleged herein.  Thus, Wells Fargo's deceptive dual tracking business acts and/or practices were unfair within the meaning of the UCL.

173.   As alleged herein, Wells Fargo's business acts and practices offend established public policies, including public policies against willful or reckless ignorance of state statutes, and frustrating economic recovery and relief for distressed California homeowners.  These practices are and were immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers such as Mr. and Mrs. Medina and thus unfair within the meaning of the UCL.

174.   At all times relevant, Wells Fargo's misconduct as alleged herein caused: 1) substantial injury to Mr. and Mrs. Medina; 2) had no countervailing benefit to consumers or to competition that could possibly outweigh these substantial injuries; and 3) caused injury that could not have been avoided or even discovered by ordinary consumers because it resulted from Wells Fargo's failure to prevent dual-tracking which Wells Fargo could have easily prevented.  Thus Wells Fargo's acts and/or practices as alleged herein were and are unfair within the

1   meaning of the UCL.

2      175.   <u>Fraudulent:</u>  Wells Fargo's acts and/or practices, as alleged herein,

3

4   were likely to deceive, and did deceive, Mr. and Mrs. Medina.  Mr. and Mrs.

5   Medina were led to believe that their loss mitigation application would be reviewed

6   and that their home would not be foreclosed on while their application was under

7

8   review.  Further, Mr. and Mrs. Medina were led to believe that if they increased

9   their monthly income to around $5,500.00, that Wells Fargo would qualify them for

10  a loss mitigation option that enabled them to keep her home.  However, Wells

11

12  Fargo sold Mr. and Mrs. Medina's home while a complete loss mitigation

13  application was under review; further, Wells Fargo fraudulently informed Mr. and

14  Mrs. Medina that they did not qualify for a temporary or permanent loan

15

16  modification when in fact their monthly income of around $5,500.00 met the

17  qualifications that Wells Fargo had stated would qualify them for such a program.

18  The regular and systematic acts and/or practices of dual-tracking constitutes

19

20  fraudulent business acts and/or practices within the meaning of the UCL.

21      176.   The unlawful, unfair and fraudulent business acts and/or practices of

22  Wells Fargo, as fully described herein  present a continuing threat to members of

23

24  the public to be misled and/or deceived by Wells Fargo.  Mr. and Mrs. Medina

25  have no other remedy of law that will prevent Wells Fargo's misconduct from

26

27  occurring and/or reoccurring in the future.

28

177.   As a direct and proximate result of Wells Fargo's unlawful, unfair and fraudulent conduct, as alleged herein, Mr. and Mrs. Medina have suffered the irreparable loss of their home and equity, have had to expend monies for relocation costs, as well as the costs to bring this action.  Mr. and Mrs. Medina are direct victims of Wells Fargo's unlawful, unfair and fraudulent conduct, and Mr. and Mrs. Medina have suffered injury in fact, and has lost money and/or property as a result of Wells Fargo's unfair competition.

178.   Mr. and Mrs. Medina are entitled to equitable relief, including restitution, attorney's fees and costs, declaratory relief, and a permanent injunction enjoining Wells Fargo from engaging in the wrongful activity alleged herein.

## SIXTH CAUSE OF ACTION
### Negligence
### California Civil Code § 1714
### (Against all Defendants)

179.   Mr. and Mrs. Medina reallege each and every allegation above as if fully set forth in this Cause of Action.

180.   Defendants owed a duty of care under California Civil Code § 1714 to Mr. and Mrs. Medina because Defendants voluntarily undertook to offer a loss mitigation alternative Mr. and Mrs. Medina and offered Mr. and Mrs. Medina a loss mitigation application.

181.   Defendants breached their duty to Mr. and Mrs. Medina by failing to review their complete loss mitigation application before moving forward with

*Medina v. Wells Fargo Bank, N.A., et al.*

**FIRST AMENDED COMPLAINT**

the foreclosure sale of their home.

182.      Defendants breached their duty to Mr. and Mrs. Medina by failing to exercise reasonable care when they continued with the foreclosure sale of Mr. and Mrs. Medina's home before making a final determination on Mr. and Mrs. Medina's loss mitigation application.

183.      As a direct and proximate result of Defendant's negligence, Defendant caused damage to Mr. and Mrs. Medina including, but not limited to, having to retain counsel to send and review NOE #1, the opportunity to be reviewed for eligibility of a loan modification timely before the irreparable loss of their home, the opportunity to be reviewed for eligibility of a loan modification timely which Wells Fargo offered as an opportunity for the Plaintiffs to cure any existing contractual defaults on the loan, the loss of equity in their home, and severe emotional distress and anguish.

184.      Pursuant to California Civil Code section 3333 Mr. and Mrs. Medina are entitled to damages in the amount that will compensate for all the detriment proximately caused by Defendant.  Since Defendant acted recklessly, with oppression, and/or malice Mr. and Mrs. Medina are entitled to punitive damages in an amount to be determined at trial, pursuant to California Civil Code section 3294.

## X.  PRAYER FOR RELIEF

**FIRST AMENDED COMPLAINT**

WHEREFORE, Mr. and Mrs. Medina pray for judgment against Defendants as follows:

1.      For judgment in favor of Mr. and Mrs. Medina and against Defendants on all claims;

2.      For actual damages according to proof, but not less than $25,000.00;

3.      For $2,000.00 in statutory damages per violation under 12 U.S.C. § 2605(f), for violations of the RESPA and Regulation X;

4.      For $50,000.00 in statutory damages and actual damages pursuant to Cal. Civ. Code § 2924.12(b);

5.      For an award to Mr. and Mrs. Medina for actual, compensatory and punitive damages for Defendants' negligence;

6.      For declaratory and injunctive relief to prevent Wells Fargo from engaging in dual-tracking practices;

7.      For any award to Mr. and Mrs. Medina for the costs of this action, including the fees and costs of experts, together with reasonable attorney's fees, costs and expenses;

8.      In the event of default, for an award of actual damages against each Defendant jointly and severally, as applicable, in an amount of at least $100,000.00 for all of the allegations contained in each and every Cause of Action;

**FIRST AMENDED COMPLAINT**

9.     For all other relief at law or in equity that Mr. and Mrs. Medina are entitled to by law that this Court deems just and proper.

## XI.  DEMAND FOR JURY TRIAL

185.   Pursuant to Federal Rule of Civil Procedure 38(b), Mr. and Mrs. Medina hereby request a trial by jury as to each and every claim for which they are so entitled.

Dated: July 22, 2019                    **LEXICON LAW, PC**


                                        By: /s/ John R. Habashy
                                        JOHN R. HABASHY
                                        **LEXICON LAW, PC**
                                        Attorney for Plaintiffs,
                                        Alejandro Medina and Cinthya Medina

**FIRST AMENDED COMPLAINT**